# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01178-SCT

*ROBERT MICHAEL WATSON*

*v.*

*PATRICIA HARRIS WATSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/26/2001 |
| TRIAL JUDGE: | HON. THOMAS L. ZEBERT |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN R. McNEAL, JR. |
| ATTORNEY FOR APPELLEE: | RICHARD C. ROBERTS, III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 06/24/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This is a divorce case in which we are asked by both parties to review the award of alimony and division of marital assets. As is sometimes the case when we are presented sharp, persuasive disagreement by knowledgeable counsel for both parties, we find several areas of the law which need clarification.

¶2.     Divorce seldom produces winners. On their wedding day, a man and woman join together as one. Should they separate soon after marriage, their separate estates and obligations to the other may be discerned rather easily. However, should they (as here) stay together for two decades, much changes.

¶3.     For instance, they develop a formula known only to themselves which divides between them their respective responsibilities and contributions to the marriage. This allows them to maximize the accumulation of assets which, invariably and to various degrees of complication, are commingled.

¶4.     Additionally, they separately develop skills which, when combined, work together to address the full array of life's needs; but when divided, scarcely meet the needs of either.

¶5.     Difficult though it may be, the termination of such a marriage requires an accounting and a fair division of those marital assets. It is soon learned that some marital assets cannot be easily divided. Some, not at all. When, as here, the parties cannot agree, it falls upon the courts to make the division.

¶6.     This matter proceeded to trial, and a final judgment of divorce was entered. Although neither party contests the granting of divorce, both parties have appealed various aspects of the award of alimony and division of marital assets.

## FACTS

¶7.     Dr. Robert Michael Watson had just completed his first year of veterinary school at Auburn University, and Patricia Harris Watson was working as a hairstylist in Jackson, Mississippi, when the two were married on June 9, 1979.

¶8.     Patricia and her two daughters joined Mike in Auburn, where Patricia established a hair salon business. While attending school and holding down a part-time job, Mike assisted with the management and bookkeeping of the salon.

¶9.     After graduation in 1982, the Watsons moved to the Gulf Coast, where Mike accepted employment as a veterinarian, and Patricia worked as a hairstylist. The following year, they moved to Jackson, where Mike went to work for Dr. Jack Ross, and Patricia went to work at Earle and Joseph Salon.

2

¶10. In 1987, Mike opened his own practice in Jackson, the Magnolia Animal Clinic, which he still owned and operated at the time of trial.

¶11. Patricia was diagnosed in 1991 with two ruptured disks and degenerative disk disease which required a spinal fusion. She was unable to work for 89 days. After the surgery, and up until trial, she continued limited work at Earle and Joseph Salon.

¶12. At some point, Mike began a sexual relationship with one of his employees. On May 12, 1999, he left Patricia and moved in with his paramour and her two children whereupon he began paying the mortgage and utilities for his new residence.

¶13. Patricia filed for divorce in April, 2000. The chancellor granted Patricia a divorce on the ground of adultery, which has not been appealed by either party, and will not be disturbed. We find we must, however, review the chancellor's award of alimony and division of marital assets, including Dr. Watson's professional practice.

## DISCUSSION

¶14. This Court employs a limited standard of review when reviewing a chancellor's decision. *Miss. Dep't Human Servs. v. Shelby*, 802 So. 2d 89, 92 (Miss. 2001). We will not disturb a chancellor's award of alimony and division of marital assets unless the court was manifestly wrong, abused its discretion or applied an erroneous legal standard. *Sandlin v. Sandlin*, 699 So. 2d 1198, 1203 (Miss. 1997).

## ALIMONY

¶15. This Court has long recognized the concept that alimony and equitable distribution should be considered together so as to prevent inequity. "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994) (citing

3

*LaRue v. LaRue*, 172 W. Va. 158, 304 S.E.2d 312, 334 (1983) (Neely, J., concurring)). "In the final analysis, all awards should be considered together to determine that they are equitable and fair." *Id.*

¶16.    In this case, the chancellor awarded Patricia a net estate valued at almost a half million dollars. Additionally, the chancellor recognized that Patricia has separate income of approximately $2,400 per month. Also, from the assets awarded to her, Patricia will realize income between $250,000 and $400,000. Considered together, under the chancellor's award, Patricia would have a separate, net estate, of approximately $700,000, to $1,000,000.

¶17.    When considering the *Armstrong* factors[1] in his original findings, the chancellor stated that Patricia's income was the only source to meet her needs, and that, "for the most part," the assets he awarded Patricia "are not income-producing assets from which [Patricia] could secure additional income without the imposition of alimony." Then, upon reconsideration, the chancellor stated that the assets awarded to Patricia would produce income between $250,000 and $400,000. However, this income which the chancellor did not consider in the original award of alimony did not serve to convince him to lower alimony. Instead, he raised it by $750.00 per month. The precise reason alimony was raised, post-trial, is unclear. A portion of the discussion seems to indicate that the debt payments assumed by Patricia may have been a factor. If so, that would be inappropriate, unless the debt was removed as a factor in calculating the division of assets (which it was not in this case). Otherwise, the same debt serves to advantage Patricia twice; first, to increase her award of assets, and second, to increase her award of alimony.

---

[1]*Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993).

¶18.    We reverse and remand for a new determination of alimony, based upon findings of fact and conclusions of law which take these matters into account.

## DIVISION OF MARITAL ASSETS

¶19.    Few appreciate the difficulty visited upon a chancellor charged with dividing marital assets in a case such as this.  I believe the chancellor's conduct of the proceedings was admirable.  His forty-four page Findings of Fact and Conclusions of Law[2] was obviously crafted after a great deal of study of the record and consideration of the numerous issues and law applicable thereto.  Additionally, both parties filed motions for reconsideration, challenging the findings in numerous respects.  The chancellor did not hesitate to reexamine his findings.  The motions were carefully considered, and the chancellor agreed with, and made, several requested changes.

¶20.    To complicate matters, almost a year following the trial in this case, this Court handed down *Singley v. Singley*, 846 So. 2d 1004 (Miss. 2002), which, as a matter of first impression in Mississippi, addressed "goodwill" of a professional practice in the context of division of marital assets. When this case proceeded to trial, the chancellor did not have the benefit of the holding in *Singley*.  Therefore, we turn first to the chancellor's valuation of Mike's veterinary clinic.

    1. The Veterinary Practice.

¶21.    The valuation of a business is nothing more than an appraisal which, depending upon the purpose for which it will be used, can be performed using one of several valid, acceptable methods.  Lenders, for instance, view a business as collateral, and their opinion of worth will generally not agree with an owner or investor.  Each person or entity seeking an appraisal or valuation must factor in those matters which are,

---

[2]We are aware of the temptation to simply adopt the proposals submitted by the prevailing party on each issue.  This Court is most grateful to Judge Zebert for his detailed analysis of each issue, which provides for a more meaningful review.

to them, important. They must also exclude those matters which would cause the appraisal to produce a false or misleading value for their purposes.

¶22. So it is with the courts in division of marital property. Where, as here, a chancellor must determine the value of a professional practice, the value must be calculated for that specific purpose, recognizing constrictions which may not be apparent in other contexts.

¶23. This Court carefully considered the issue of valuing a professional practice in *Singley*. It seems to us at first blush that one should have difficulty misunderstanding the following language:

> We join the jurisdictions that adhere to the principle that <u>goodwill should not be used</u> in determining the fair market value of a business, subject to equitable division in divorce cases.
> . . .
>
> The term <u>goodwill</u> as used in determining valuation of a business for equitable distribution in a domestic matter is a rather nebulous term clearly illustrating the difficulty confronting experts in arriving at a fair, proper valuation. <u>Goodwill within a business depends on the continued presence of the particular professional individual</u> as a personal asset and <u>any value that may attach to that business as a result of that person's presence</u>. Thus, **it is a value that exceeds the value of the physical building housing the business and the fixtures within the business**.

*Singley*, 846 So. 2d at 1010-11 (emphasis added). However, what seemed clear under the facts in *Singley*, are not so clear under the facts of this case. We shall use this opportunity to clarify our holding in *Singley*.

¶24. In reaching its conclusion in *Singley*, this Court carefully reviewed the approach taken in other jurisdictions, and "join[ed] the jurisdictions that adhere to the principle that goodwill should not be used in determining the fair market value of a business subject to equitable division in divorce cases." *Singley*, 846 So. 2d at 1010. The Court then cited numerous cases, and assigned to them, respectively, the following parentheticals:

6

(holding failure to assign goodwill value to business was not erroneous where any goodwill rested solely on husband's well known reputation and abilities and his <u>continued existence and involvement</u> in the business);

(goodwill in professional practice is not marital property, but is an <u>aspect of income potential to be considered in maintenance and support</u>);

(noting that professional goodwill is an <u>aspect of income potential and should be reflected in maintenance awards otherwise additional consideration of goodwill is duplicative and improper</u>);

(stating that Indiana law adheres to the rule that goodwill based on the personal attributes of the individual is not properly part of the marital estate);

(goodwill in medical practice is not an asset subject to division in dissolution);

(goodwill in a doctor's practice is not a divisible asset because it does not possess value or constitute an asset <u>separate and apart from the doctor's person or ability to practice the profession</u>);

(marital estate does not include goodwill of husband's partnership interest in law firm).

*Singley*, 846 So. 2d at 1010-11 (citations omitted) (emphasis added).

¶25.    As stated in *Singley*, goodwill is a nebulous term. It "depends on the continued presence of the particular professional individual as a personal asset and <u>any value that may attach to that business as a result of that person's presence</u>." *Id.* at 1011 (emphasis added). In a furniture or appliance business with several owners, it would be difficult to assess the value to the business attributable to one of the owners. Customers go to the business looking for furniture or appliances. However, in the context of a single-owner professional practice, it becomes less difficult. Patients (including pet owners) go there looking for their doctor.

¶26.    The inequity which led to the decision in *Singley*, and the inequity which is so glaringly present in this case, occurs where the marital assets to be divided in a divorce include the goodwill of a professional

7

practice.  This is particularly true where, as here, the professional practice has one owner/professional.[3]

Unless the valuation of the professional practice carefully avoids any element attributable to the presence and work of the professional, the result will be a double award to the spouse.  The professional's income will be used, first to calculate alimony, and then again to calculate the value of the "business."  That is exactly what happened in this case.

*The First Award – Alimony*.

¶27.    Permanent, periodic alimony was awarded to Patricia based primarily on Mike's income.  Specifically, the chancellor found Mike's and Patricia's net monthly income to be $7,794.42,  and $2,393.34, respectively.  These two net income amounts, when added together, total $10,187.76, per month.  Patricia was awarded monthly periodic, permanent alimony in the amount of $3,250.00 which, when added to her monthly income of $2,393.00, increases her monthly income to $5,643.34.  Mike, on the other hand, will have monthly income, after alimony payments, of $4,544.42.

¶28.    Thus, as a result of the chancellor's award of alimony, Patricia's income will exceed Mike's.  Stated differently, Patricia will have approximately 55% of the parties' combined income.  Based upon the approach taken by the chancellor, it cannot be denied that Mike's income has been "divided up" in the award of alimony.

*The Second Award – Value of the Practice*.

¶29.    Mike is the sole owner of Magnolia Animal Clinic (the "Clinic").  It is from this Clinic that he derives his income.  The tax returns relied upon by the chancellor reveal that the Clinic income was virtually

---

[3]The fiction which, as here, leads to the inequity is the assumption that a single owner professional can sell and leave his or her practice which was built up over many years, and the practice will continue as before.  That the value of the practice would be sharply diminished by loss of the professional, even when replaced by another professional, would seem obvious.

all of Mike's income. The valuation of the Clinic used by the chancellor to calculate the award to Patricia was based upon projected future income of the Clinic. That is to say, the award was based upon Mike's predicted future earnings – the same earnings which already were divided in the award of alimony.

*Koerber's Valuation of the Clinic.*

¶30. Patricia called James A. Koerber, CPA, to provide an expert opinion as to the valuation of the Clinic. Koerber testified that he could have appraised the Clinic by (1) looking at its assets ("asset-based" approach), (2) surveying the market for similar sales ("market-based" approach), or (3) placing a value on the earning potential ("income-based" approach). In this case, Koerber used the income-based approach. When asked if he used the asset-based approach, he testified:

> We considered it.[4] You always consider all three approaches. But because Mike's practice is a service business, you know, assets are really not the major generator of income. The major generator of income is services. So we considered it, but didn't feel like it applied in this situation. . . . But in businesses such as this where you have a professional entity, you really don't look at the asset approach." [5]

He further testified:

> A. Basically, you're looking at what the cash -- what the cash will be available to the owner or owners of a business without jeopardizing the business itself. It's whatever can be returned to the owner.
>
> Q. Okay. What is capitalized cash flow method?
>
> A. It's basically the same thing. But instead of looking at a longer period of time, which the discounted cash flow uses, you look at a single period of time to come up with the value.
>
> ...

---

[4]Koerber testified that he neither inspected nor valued the assets of the Clinic.

[5]This is, indeed, curious testimony from a CPA who, when serving in *Singley* as a court-appointed expert, did in fact use the asset-based approach to value a dental practice. It is also interesting and instructive that, in that case, he arrived at a value of $145,000 – less than half the value he places on Mike's veterinary practice. *Singley*, 846 So. 2d at 1009-10.

Q.     All right. Okay. How did you come up with your final value of $325,000?

A.     The final value for $325,000 we really went back and looked at what -- under the income approach, we basically looked at that -- if you looked at the discounted net cash flow and the capitalized cash flow, we felt like, you know, that was a pretty good range. So we basically took an average of those two figures to come up with $325,000.

¶31.   Because Koerber's testimony is crucial to the question of whether the requirements of *Singley* were followed, it is necessary to go into it in some additional detail.

¶32.   To develop an earnings pattern for the Clinic, Koerber examined its historic "net cash flow."[6] He then used that past experience to predict what would happen in the future.[7] That is to say, he projected future earnings based on past earnings, and from these future earnings, he estimated the value of the Clinic. The calculations and approach used by Koerber, and accepted by the Chancellor, were improper for two reasons.

¶33.   First, Koerber valued the Clinic based upon the earnings and personal contribution of Mike. These earnings are dependant upon Mike's personal, professional practice. This approach is forbidden by *Singley*, which cites with approval, *In re Marriage of Claydon*, 306 Ill. App. 3d 895, 715 N.E.2d 1201 (1999) ( "professional goodwill is an <u>aspect of income potential</u> and <u>should be reflected in</u>

---

[6]Mike was the sole owner of the Clinic, and the "cash flow" of the Clinic is nothing more than Mike's earnings.

[7]When asked how he arrived at the valuation for the Clinic, Koerber testified that it was "a projection based on historical information. . . ." When asked to explain "net cash flow," he testified:
     As far as net cash flow, you look at, basically, the income and expenses from the business. You deduct from there the – any debt service and also any capital expenditures to buy new equipment and so forth for the practice to come up with what is available to an owner of a business. **So basically, you're really seeing what is left in the bank, you know, for the person after they – they've removed all the necessary operating expenses**.

10

maintenance awards, otherwise additional consideration of goodwill is <u>duplicative and improper</u>.").
*Singley*, 846 So. 2d at 1010 (emphasis added).

¶34.    Second, Koerber did not take into account that Mike would be ordered to pay alimony based upon an annual income of $158,000. Koerber projected the income of the Clinic into future years, arriving at a total amount of earnings he expected for the Clinic. He then deducted from those predicted earnings approximately $93,000 per year, an amount he assumed necessary to provide a replacement for Mike.[8] Koerber's theory was that, since Mike could be replaced with a $93,000 per year employee, all earnings of the clinic above the $93,000 were profits which had nothing to do with Mike.

¶35.    Thus, according to Koerber, all earnings above $93,000 were included in his value of the Clinic, and are fair game to be divided with Patricia. But, as already stated, the chancellor did not use $93,000 to calculate alimony. He used Mike's true annual income of $158,000. Therefore, the portion of income which exceeds $93,000 was used to calculate both alimony for Patricia, and the value of the Clinic to be awarded to Patricia.

¶36.    Theoretically, Koerber was justified in using the $93,000 deduction, if his mission was to demonstrate the earning potential of the Clinic with an assumed replacement for Mike.[9] But that mission would require two unrealistic assumptions: First, that Mike's expertise, skill and customer loyalty could be replaced with a $93,000 per year employee; and second, the Clinic would suffer no loss in business or

---

[8]Koerber arrived at this "comparable compensation" by opining that the mean, average wage for a veterinarian in Jackson, Mississippi, is $49,960, and he added to that, $44,300, which is the mean income of a labor relations manager.

[9]This assumption requires one to believe that the "replacement" doctor would have the same value to the Clinic as Mike, and to further assume that the Clinic would lose no business as a result of Mike leaving. This would require us to accept that people are loyal to buildings, not doctors. We decline to accept this theory.

income as a result. Furthermore, Koerber had no way to know the chancellor was going to award alimony to Patricia, so he could not have accounted for it in valuing the Clinic.

¶37.	Thus, even if *Singley* had been decided differently, Koerber's method would still have been incorrect, since the $68,000 difference between the two income amounts would have been used twice to calculate an award for Patricia; once for alimony, and again for valuation of the Clinic.

*Goodwill.*

¶38.	During his direct testimony at trial, Koerber never mentioned goodwill. His report which was admitted at trial does not address goodwill.[10] The calculations in his report, and his direct testimony, clearly indicate that he made no reduction whatsoever in the value for goodwill.

¶39.	On cross-examination, however, Koerber was asked several times whether his valuation assumed that Mike would remain at the Clinic. He could not answer. When challenged concerning whether Mike had any "professional goodwill," that would go with him, should he leave the practice, Koerber provided the following response:

> We took that – we took into consideration what a comparable person would earn, you know, as far as the business goes – as far as the practice goes – I'm sorry – and came up with the value of approximately $94,000. Basically, that's removing any personal goodwill. All we're looking at is the value of the practice.

¶40.	This testimony demonstrates that Koerber's definition of goodwill is (to put it charitably) different from what one would expect, and certainly different from this Court's discussion of goodwill in *Singley*. Under Koerber's courtroom definition, "goodwill" seems to be nothing more than the amount of money an average veterinarian would make. Stated another way, Mike's goodwill had nothing to do with Mike.

---

[10]Koerber did state in his report that "[i]f the practice were to lose its owner, Robert Michael Watson, the Practice may experience a decline in business." Nowhere in his calculations, however, does he take this into account.

Stated still another way, since $93,000 would hire a veterinarian to run the Clinic, then that, somehow, sets the amount of Mike's goodwill. How? If Koerber's opinion and approach had any merit, then the goodwill of every single-owner veterinarian clinic in the country is approximately $93,000.[11] There may be some abstruse accounting theory which employs this application and definition of goodwill, but it certainly does not fit within the context of *Singley*, or any of the other cases reviewed.

¶41. It could have been the extra caution of good "lawyering," or possibly that Patricia (or her counsel) sensed an imminent decision from this Court with respect to whether "goodwill" of a professional practice should be included in marital assets. For whatever reason, Patricia submitted a post-trial affidavit from Koerber, which attempted to persuade the chancellor that "personal goodwill" had been considered, and was properly reflected in his opinion and testimony. However, repackaging and relabeling the evidence and opinions after trial cannot convert to market value that which is obviously personal goodwill. Instead of shedding light on his view of goodwill and its application in this case, Koerber's affidavit further establishes that he did not, in fact, consider goodwill in the context of *Singley*.

¶42. The chancellor, stating that "Mike was basically a 'one-man business whose reputation as an individual had a large impact on the value of his business," reduced Koerber's opinion of valuation by $75,000. There is absolutely no evidence supporting this reduction of the original valuation. There is literally no testimony or other evidence regarding the extent to which Mike's "goodwill" increased the value of the business. While it appears the chancellor obviously found Koerber's appraisal to be flawed, he does not explain the flaw, nor does he explain how the $75,000 reduction serves to cure it.

---

[11]If $93,000 is enough to replace Mike in Jackson, then it is enough to replace any veterinarian anywhere in the country, allowing for small cost of living differences here and there.

¶43.    As stated above, "goodwill" is a "rather nebulous term." Some of our sister States have recognized that this nebulous term is actually comprised of two separate but related concepts. The Indiana Supreme Court has described goodwill as "the value of a business or practice that exceeds the combined value of the net assets used in the business." *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999). The Indiana court determined that, in a professional practice, goodwill could be "attributable to the business enterprise itself by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business." *Id.* However, goodwill might be associated with the "individual owner's personal skill, training or reputation." *Id.*

¶44.    Enterprise goodwill "is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers." *Id.* (quoting Allen Parkman, *The Treatment of Professional Goodwill in Divorce Proceedings*, 18 FAM. L.Q. 213, 215 (1984)). Further, the court in *Yoon* stated:

> Factors affecting this goodwill may include a business's location, its name recognition, its business reputation, or a variety of other factors depending on the business. Ultimately these factors must, in one way or another, contribute to the anticipated future profitability of the business. Enterprise goodwill is an asset of the business and accordingly is property that is divisible in a dissolution to the extent that it inheres in the business, independent of any single individual's personal efforts and will outlast any person's involvement in the business. It is not necessarily marketable in the sense that there is a ready and easily priced market for it, but it is in general transferrable to others and has a value to others.

711 N.E.2d at 1268-69 (internal citations omitted). In contrast, the court in *Yoon* concluded that personal goodwill is a personal asset and as such, is not divisible at divorce. *Id.* at 1269. This is true because "any value that attaches to a business as a result of this "personal goodwill" represents nothing more than the future earning capacity of the individual." *Id.*

14

¶45. A close reading of our opinion in *Singley* reveals that we have not explicitly addressed any distinction between "personal goodwill" and "business enterprise goodwill," although we did note that other jurisdictions recognize both. *Singley*, 846 So. 2d at 1010 n.2.

¶46. We now hold that, although there is a distinction between "personal goodwill" and "business enterprise goodwill," neither should be included in the valuation of a solo professional practice for purposes of a division of marital assets. In such cases, the two are simply too interwoven and not divisible.

¶47. In his calculations, Koerber applied a specific company risk factor "of five percent (5%) to the discount rate to reflect that Mike's practice was a sole proprietorship and therefore has a greater risk than a professional practice." Koerber made no effort to relate the five percent reduction to goodwill.

¶48. Koerber testified that there was no real customer base associated with the clinic, but his report includes name recognition of the practice as a factor. Any name recognition of the clinic is due to Mike's personal efforts, and his practice. Stated differently, "Magnolia Animal Hospital" is synonymous with "Dr. Robert Michael Watson."

¶49. Furthermore, Koerber's report considers the reputation of the clinic. In a solo practice like Magnolia Animal Hospital, the reputation of the clinic is synonymous with the professional's reputation; that is to say, Mike's professional reputation is imputed to the clinic. Because Mike managed the practice as its sole owner, he established business relationships with suppliers and the company employees. Thus, under such circumstances, personal goodwill and enterprise goodwill are actually the same.

¶50. Here, as in *Singley*, neither party raises the issue of whether "goodwill" includes "personal goodwill," "business enterprise goodwill," or both. Since this is a matter of first impression for this Court, we clarify this Court's holding in *Singley*, and hold that, for purposes of division of marital assets, both "personal goodwill," and "business enterprise goodwill" must be excluded from the valuation of a solo

15

professional practice. Upon remand, the parties may address this issue by providing evidence of the valuation of the clinic, absent goodwill. In the event an asset-based approach is used, the valuation should not exceed the fair market value of the tangible assets, assuming they were sold in their current configuration.[12] Although we do not foreclose the use of other valuation methods, we are mindful that, in using the income approach, extracting goodwill would seem difficult, and must be carefully accomplished and explained.

### 2. The Commercial Building.

¶51. Patricia argues that the trial court erred in assessing the value of the commercial building at $120,000. She contends that the building should have been valued at $150,000. She points out that the parties consistently valued the building at $150,000 on a number of financial statements. Additionally, the chancellor noted that, prior to the divorce action, Mike had listed the value at $150,000 on financial statements and loan applications.

¶52. However, at trial, Mike testified that, in his opinion, the value of the building was presently worth $120,000, basing the decrease in value on foundation problems. No tax receipt of the tax assessment value of the property was provided to the trial court.

¶53. As neither party offered expert testimony or other evidence as to the value of the building, we do not find that the trial court erred in accepting Mike's testimony as to the value. As the evidence does not indicate that the trial court abused its discretion, this issue is without merit.

### 3. The Marital Home.

---

[12] The value of the assets when sold together, already installed and in working order, may exceed the value of the same assets sold separately. There can certainly be additional value assigned to a new owner's ability to walk in and go to work. Such additional value, if any, may be included in the division of marital assets, since it is unrelated to the past performance, income or patient/customer base of the practice.

¶54.    We now address several issues raised concerning the marital home.

*Tax Roll Assessment*

¶55.    Mike contends that the trial court erred in assessing the value of the marital home to be $302,772. The trial court determined that, based on its experience, the value assessed by the county tax assessor was approximately 85% of the appraised true value. Therefore, the trial court increased the tax roll assessment of $263,280 by 15% or $39,492 to $302,772.

¶56.    Neither party offered any expert opinion as to the value of the marital home before the trial court made its decision. Patricia testified she believed that the value of the marital home was approximately $350,000. Mike testified that he believed the value was approximately $425,000, but he offered nothing to support that amount. The cost of construction on the home in 1992 was approximately $220,000.

¶57.    Because both parties provided opinions to the chancellor which were higher than the chancellor's calculation, and because the chancellor applied his "experience" without any evidence in the record which would cause such experience to apply to the facts of this case, we must reverse the chancellor's valuation, and remand for a determination of the value, as of the date of trial, of the marital residence. Both parties will have an opportunity, on remand, to provide opinions and expert testimony as to the value.

*Trustmark Home Mortgage*

¶58.    Mike briefly states that the trial court erred in failing to reduce the outstanding mortgage balance of the marital domicile by the amount of payments he made during the time period between the filing of the complaint for divorce and the judgment of divorce. These payments, he contends, resulted in Patricia receiving at least a $8,000 increase in the equity of the marital home. In setting the outstanding mortgage in its original findings of fact and conclusions of law, the chancellor stated:

> There was some small differences in the parties' evidence regarding the outstanding balance of the Trustmark house mortgage. Mike [Mike] listed the liability at $110,000.00.

17

Patricia listed the outstanding at $114,624.00. Patricia's testimony was that this figure was the exact figure she received from the bank the week prior to trial. The Court finds that the outstanding balance of this mortgage indebtedness to be $114,624.00.

¶59. Attached to his motion for reconsideration, Mike produced a letter dated February 7, 2001, from Ginger Sprinkle, payoff/assumption supervisor, at Trustmark Bank, which listed the present principal balance as of April 1, 2001, at $106,372.61. The trial court did not specifically address the issue of the outstanding mortgage in its amended findings of fact and conclusions of law dated May 31, 2001. Trial in this matter was held on November 8, 9-10, 2000.

¶60. This matter may be revisited upon remand, as the parties will have the opportunity to provide accurate, current data.

*Reduction of $77,777 in Value.*

¶61. Mike contends that the chancellor erred in reducing the value of the marital domicile by $77,777, due to the portion of the house built by Patricia's parents. In its original findings of fact and conclusions of law, the trial court stated:

> The Court finds that it would be inappropriate to use a value of $77,777.00 and decrease the appraised value by such amount because if the Court awards this house to the wife, the benefit of $77,777.00 would ultimately be realized by Patricia. This Court sees no deed wherein the addition completed by the parents was ever shown to have been deeded to Patricia's parents and therefore the total property of record as of the date of the hearing was jointly owned by Patricia and Mike [Mike]. This Court finds that the value of the former marital residence to be $302,772.00.

¶62. On reconsideration, the trial court cited no authority for the change in the treatment of the $77,777 so claimed by Patricia to be attributed to her mother, nor does Patricia provide any such authority on appeal.

¶63. In fact, Patricia does not even attempt to distinguish the case sub judice from our holding in *Henderson v. Henderson*, 757 So. 2d 285 (Miss. 2000). The facts in *Henderson* are similar to the

18

facts here, except the money contributed by the wife's mother was greater than the amount attributed to Patricia's mother.[13] In **Henderson**, based on the parties' testimony, the wife's mother contributed approximately $116,000 to $235,000 in construction costs in exchange for the assurance that she could live there and be taken care of for the remainder of her life. **Id.** at 286, 288. The trial court determined that 1/3 of the net equity of the marital home was non-marital property, and awarded the wife's mother 1/3 net equity ($66,633.33) in the marital home. **Id.** at 289-90.

¶64. On appeal, this Court reversed, noting that the wife's mother "was not named in the deed, nor was any written document presented evidencing any ownership in the house in her." **Id.** at 291. The Court went on to state:

> The record shows that the chancellor considered Mrs. Lawson's $116,000 contribution in determining what share of the marital domicile was due to both parties under the first Ferguson factor. **Ferguson v. Ferguson**, 639 So. 2d 921, 928 (Miss. 1994). He determined that the $116,000 was Mary's contribution alone. This was also error. Mrs. Lawson's $116,000 contribution was not a gift to her daughter. It was the consideration in an agreement between Mrs. Lawson and the Hendersons. It was procured by both Mary and Howard. We have stated that all assets "acquired or accumulated during the marriage" are marital assets subject to equitable distribution. **Hemsley v. Hemsley**, 639 So. 2d 909, 915 (Miss. 1994). Therefore, Mary alone did not directly or indirectly contribute $116,000 to the acquisition of the marital home. Gifts may be made to either party to a marriage or to the marital union itself. Under facts such as those before us, we can only conclude that the contribution of Mary's father, on the one hand, and the contributions bargained for from Mrs. Lawson on the other, were both made to the marital union of the parties, rather than to an individual partner of the marriage. Therefore, such assets, absent clear proof otherwise, are assets of the marital estate.

¶65. Based on this Court's holding in **Henderson**, we find that the trial court erred in modifying its judgment on reconsideration by reducing the value of the marital home by $77,777 to reflect the

---

[13] Patricia contends that her mother, Harris, contributed approximately $46,000 to the construction of an attached 1100 sq. ft. apartment. Harris did not testify. Based on Patricia's testimony, the trial court accessed a value on the 1,000 sq. ft. apartment of $77.77 per sq. ft., or $77,777 in its original findings of fact and conclusions of law dated February 2, 2001.

contribution of Patricia's parents and, upon rehearing, the value of the marital home should not be reduced for that purpose.

¶66.    We now turn to several issues the chancellor should take into account upon remand and recalculation of the value and division of marital assets.

        4.  Consideration of Fault.

¶67.    A recitation of all the facts surrounding Mike's affair and conduct is not necessary.  It is sufficient to say that Mike's adultery was not a "slip-up," peccadillo, or occasional indiscretion.  He moved out of the marital home he had shared with his wife for twenty years, and began an open, continuous, adulterous affair.  He began to invest his time, society, companionship and assets into the nurturing and development of another home, leaving Patricia to her own emotional survival.  This is the stuff of "marital fault" which led the *Singley* court to reverse the chancellor for dividing the marital property equally, a division which obviously placed "minimal weight" upon fault.

¶68.    The central question is whether the adulterous conduct "impacted and burdened the stability and harmony of the marriage."  *Singley*, 846 So. 2d at 1009.  *See also **Ferguson***, 639 So. 2d at 928.  Because the trial court obviously ignored conduct and equally divided the assets, *Singley* was remanded for a recalculation of the percentages.  The same is required here.

        5.  Calculations in Valuing the Marital Property.

¶69.    Before applying the *Ferguson* factors to make an equitable distribution of the marital property, the trial court devoted 11 pages of his original findings of fact and conclusions of law to first identify "marital property" as opposed to "separate/nonmarital property" according to *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994).  In *Ferguson*, this Court established the factors that should be considered in reaching a decision on the equitable distribution of marital property.  *Ferguson*, 639 So. 2d at 928.  The

20

chancellor devoted 15 pages of his original findings of fact and conclusions of law to applying the *Ferguson* factors to the marital assets and liabilities in order to provide an equitable decision. In doing so, the chancellor stated:

> The Court has attempted to apply each and every one of the *Ferguson* factors to each marital asset and liability, both collectively and individually. From the application of the factors the Court finds, based upon the evidence presented, that this marriage was an equal partnership in every sense of the word until Mike [Mike] began a sexual relationship with his employee, Laurie Foil. The Court finds that Patricia should receive approximately fifty percent (50%) of the net assets acquired and accumulated during this marital partnership based upon her direct and indirect economic contributions, her contribution to the stability and harmony of the marriage, and the other factors set forth in the *Ferguson* decision.

¶70. In his original findings of fact and conclusions of law, the chancellor divided $1,216,662.52 in marital assets, with Mike receiving $566,113.48 and Patricia receiving $650,121.07. Patricia was assigned the marital liabilities totaling $162,955.99 which, when deducted from her assets, left her with net assets of $487,165.08, and a deficit of $78,948.40.

¶71. In order to render a 50% division of the marital assets and liabilities and correct the deficit, the chancellor awarded Patricia $39,474.20 (½ the deficit) to be paid in three equal yearly installment payments of $13,158.07.

¶72. Both parties filed motions for reconsideration. As a result, the chancellor amended his findings of fact and conclusions of law. Thereafter, the chancellor entered a Judgement, which included a list of asset values. The amended findings of fact and conclusions of law, and the asset values listed in the Judgment, reflect the following significant changes:

- The value of the marital home was reduced by $77,777.

- $26,881.32 was added to Mike's assets for his certificate of deposit which was discussed by the trial court in its original findings of fact and conclusions of law but omitted in the division of assets.

21

- Patricia's marital personal property (furniture, jewelry, etc) was reduced by $15,000. The trial court's charts reflect a $15,000 reduction in the value assigned to Patricia's marital personal property (furniture, jewelry, etc.) from the original decision to the decision rendered on reconsideration. The original chart in the original decision designates Patricia's marital personal property (furniture, jewelry, etc.) at $35,000 ($20,000 for furniture, furnishings and appliances plus $15,000 for the marital property, a Rolex watch). The chart contained in the reconsideration decision designates Patricia's personal property (furniture, jewelry, etc.) at $20,000, resulting in a $15,000 reduction by the trial court. The only explanation provided by the trial court in reaching the reduction was that a Rolex watch, awarded to Patricia, should be reduced from $15,000 to $5,000 on reconsideration. This should have resulted in a $10,000 reduction, rather than a $15,000 reduction. It appears there was an error in transferring the amounts. On reconsideration, the written decision states that the value of Patricia's marital personal property is $25,000, including the Rolex watch. However, the numerical chart lists the amount of Patricia's marital personal property as $20,000. Therefore, based on a lack of explanation by the trial court as to the $5,000 discrepancy between the written decision and the numerical chart used to divide the marital estate, there exists a mathematical error of $5,000.

¶73.    The trial court's judgment contains other mathematical errors not briefed by either party.[14] Mike's assets were understated in the judgment by $85,380. Mike was actually awarded $592,994.80 of the marital assets by the trial court, when adjusting for mathematical errors.[15] Patricia's award was listed in the Judgment as $557,344.07. According to paragraph 6 of the judgment, it should have been increased by $77,777, to $635,121.07. Patricia's marital personal property was incorrectly stated as $20,000, rather than $25,000, which would require an addition of $5,000 to Patricia's total marital personal property. Therefore, applying corrected calculations to the chancellor's amended findings, Patricia's total marital assets would be $640,121.07.[16]

---

[14]   The trial court prepared charts in its original Findings of Fact and Conclusions of Law, its Amendment to Prior Findings of Fact and Conclusions of Law, and its Judgment. The chart of assets included in the Judgment contains the mathematical errors.

[15]   507,614.80 + 85,380 = $592,994.80

[16]   $557,344.07 + 77,777 + 5,000 = $640,121.07

¶74. Patricia was assigned all the marital debt of $162,955.99. Therefore, Patricia was actually awarded $477,165.08.[17] Under the amended findings, as corrected, Patricia would have been left with a deficit of $115,829.72.[18] Adjusting the award of marital assets and liabilities to account for Patricia's deficit in order to maintain the trial court's equal division of the marital estate, Patricia would have been awarded $57,914.86, rather than $56,613.36 awarded by the chancellor.[19]

¶75. We have set forth these errors and recalculated the asset award solely for the purpose of assisting the chancellor on remand. We do not mean to suggest any particular division of assets, as that must be done by the chancellor after consideration of all matters discussed herein.

*Expert Costs and Interest Rate.*

¶76. The chancellor ordered Mike to pay Patricia's expert fees and expenses. This was improper. This Court has held in numerous cases that attorney fees should not be awarded unless the requesting party is unable to pay. *See, e.g.,* ***Creekmore v. Creekmore***, 651 So. 2d 513, 520 (Miss. 1995). The expert fees of Patricia should not be considered differently. Here, the value of Patricia's separate estate will far exceed the threshold for consideration of an award of attorney fees and costs.

¶77. Additionally, the chancellor ordered Mike to pay interest at 8%, per annum, on past-due installments. Upon remand, the chancellor should reexamine this rate in light of today's prevailing interest rates. *See* Miss. Code Ann. § 75-17-7.

**CONCLUSION**

---

[17] $557,344.07 + 77,777 + 5,000 - 162,955.99 = $477,165.08

[18] Mike's total marital estate $592,994.80 - Patricia's total marital estate $477,165.08 = $115,829.72 deficit to Patricia.

[19] $115,829.72 deficit/ 2 = $57,914.86 cash payment.

¶78. It is surprising to hear it argued by the dissent that this Court's decision is "devastating" for Patricia. In response, and in conclusion, we shall do no more than mention two points.

¶79. First, and least important, the dissenter is presumptuous in assuming that remand will not be favorable to Patricia. We are reversing because of several errors which cannot be overlooked, and which contributed to an award of alimony and division of marital property which were inconsistent with controlling law. For instance, when dividing marital assets, the chancellor failed to give weight to the uncontested fact that Mike's adulterous relationship caused him to vacate the marital home and emotionally abandon Patricia. This conduct certainly "impacted and burdened the stability and harmony of the marriage". See *Singley*, 846 So. 2d at 1009. *See also*, *Ferguson,* 639 So. 2d at 928. Remand might very well result in a division of property more favorable to Patricia. If so, the term "devastating " would hardly seem appropriate.

¶80. Second, and most important, we are bound by oath to follow the law. The law requires, for the reasons stated, that this case be reversed and remanded. Therefore, we reverse and remand.

¶81. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., AND CARLSON, J., CONCUR. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, DISSENTING:**

¶82. Because the decision of the chancellor should be affirmed, I respectfully dissent.

24

¶83.    First, this Court will not disturb a chancellor's findings unless there is manifest error, abuse of discretion or an application of the wrong legal standard. ***Sandlin v. Sandlin***, 699 So.2d 1198 (Miss. 1997). As will be discussed below, I find that there was no abuse of discretion or legal errors.

¶84.    Because both the majority and Justice Easley's opinion fully discuss the opinion from the chancellor, I will not discuss in depth his findings. However, I note that the chancellor's findings of fact and conclusions of law were forty-plus pages long and reflected serious and thorough deliberations by the chancellor. Subsequently, following requests from both parties for rehearing, the chancellor entered a substantial amendment to his earlier findings. Reading both documents together, there is positively no evidence that the chancellor's ruling was capricious. Therefore, there was no abuse of discretion.

¶85.    Second, regarding valuation of the marital home, Dr. Watson now receives an opportunity to correct his failure to substantiate his valuation of the house. As the other opinions note, *neither party* offered or requested an expert to testify to support their respective valuations. Dr. Watson argued a value reflecting almost 100% appreciation from the original cost to construct the home in 1992. (i.e. appreciation from $220,000 to $425,000 in eight years). In opposition, Mrs. Watson contended that the value of the home was $350,000. Ultimately, with no expert proof presented by either party, the trial court relied on the value as assessed by the county tax assessor and added 15%. This resulted in a value of $302,772.

¶86.    Not pleased with this valuation, Dr. Watson finally requested in his motion for rehearing that the chancellor appoint an expert. Now on appeal, the majority says that the chancellor erred in relying on his experience. Such a holding begs the question: *What should a chancellor rely on when determining the value of property in proceedings where the parties fail to submit anything other than their own testimony*? Moreover, substantiating the chancellor's decision is the tax assessment and the experience he acquired in many, prior proceedings where he was presented arguments

25

on property value and ruled. Though I certainly agree that the value assessed for tax purposes does not reflect market value, both parties took the risk that the chancellor would seek an unbiased valuation. A lack of diligence by the parties does not warrant reversal and remand.

¶87. Finally, I note my reservations regarding this Court's holding in *Singley v. Singley*, 846 So.2d 1004 (Miss. 2002). Though I know that the principle of stare decisis must factor in to all rulings, *Singley* placed us in the company of only four other jurisdictions take the position that neither *personal* nor *enterprise goodwill* in a professional practice constitutes marital property. *See May v. May*, 589 S.E.2d 536, 544 (W.Va. 2003). That goodwill may be a nebulous concept is not a sufficient justification for completely excluding it in calculating the value of the marital estate. Moreover, *Singley* fails to cite how or why, in the context of equitable distribution as opposed to wrongful death situations or ordinary business transactions, goodwill is too nebulous for our trial courts to consider. The equity aspect of the concept of *equitable distribution* is hardly served by the exclusion of goodwill and the strict reliance on book value.

¶88. Last, I note that there was no testimony that goodwill was ever considered in the valuations. Stating that "'Magnolia Animal Hospital'" is synonymous with "'Dr. Robert Michael Watson,'" the majority takes a great liberty in interpreting the report prepared by Koerber.

¶89. For these reasons, I respectfully dissent.

**EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶90. As I do not concur in whole with the majority's disposition of this case, I must therefore respectfully concur in part and dissent in part. In my opinion, the majority's decision results in a devastating holding to the weaker spouse, in this case, the wife, Patricia. Not only is Patricia the financially weaker spouse, Dr. Watson made the conscious decision to violate his marriage vows and destroy the marital union. Dr.

Watson ended his 20+ year marriage by having a sexual relationship with one of his employees. In fact, Dr. Watson moved out of the marital home and moved in with his mistress, contributing financial support in that relationship. In a proceeding for divorce there is never a clear winner, however, I do not agree with the reasoning applied by the majority.

¶91. Patricia and Dr. Watson were married on June 9, 1979, in Rankin County, Mississippi. Patricia worked as a hairstylist while Dr. Watson attended and completed veterinary school at Auburn University.

¶92. Dr. Watson accepted employment after graduation from veterinarian school in 1982 and moved to Ocean Springs, Mississippi. Patricia continued to work as a hairstylist in Gulfport, Mississippi. After approximately a year in Ocean Springs, Dr. Watson and Patricia moved to Jackson, Mississippi. Dr. Watson went to work for Dr. Jack Ross in 1983, and Patricia went to work at Earle and Joseph Salon, a hair salon. In 1987, Dr. Watson decided to open his own practice, the Magnolia Animal Clinic, in Jackson which he still owns and operates.

¶93. In 1991, Patricia was diagnosed with two ruptured disks and was hospitalized for two weeks. She was unable to work for 89 days. She had a degenerative disk disease which required one spinal fusion operation. Patricia continued to work at Earle and Joseph Salon but less then before due to her physical problems. When Patricia originally saw Dr. Robert McGuire, orthopedic surgeon, she had a disk herniation at the lumbar 3-4, and also at the lumbar 4-5. In 1998, she was diagnosed with a disk herniation at the cervical 5-6 which eventually resulted in surgery to replace the disk with a bone graft. Dr. McGuire testified that Patricia's condition causes considerable pain. He testified that he prescribes anti-inflammatory medications for her, and muscle relaxers to take periodically as needed. Dr. McGuire testified that as a result of Patricia's medical condition, she is simply unable to work full time as before. Dr. McGuire further

testified that he would expect Patricia to have between one and three episodes per year when acute pain would prevent her from being able to work. Patricia's only work experience had been as a hairstylist which required a significant amount of standing.

¶94. At the time of the divorce, Patricia was 50 years old; Dr. Watson was 43 years old. Patricia's testimony, unrebutted by Dr. Watson, was that Patricia and Dr. Watson had made plans in late December of 1998 for her to retire in June, 1999, due to her back condition. Patricia gave her employer official notice of her intent to retire in January, 1999. Carol Booker, the business manager at Earle and Joseph's, Patricia's employer, testified that Patricia and Mike has had several conversations about Patricia's back problems. Booker also testified that Patricia is working at her maximum capacity, and is unable to earn more than her current income. Booker was aware of Patricia's intention to quite working due to her physical problems. Dr. Watson's sexual relationship with Laurie Foil (Ms. Foil) ended Patricia's plans to quit working.

¶95. Furthermore, for most of the marriage, Patricia maintained disability insurance to protect her earning capacity for the family. In 1998, Dr. Watson suggested that they drop the disability insurance coverage and use the premium money for other purposes. Therefore, Patricia was left without the possibility of receiving disability income based on the reliance of Dr. Watson that due to their financial status they no longer needed that coverage.

¶96. Dr. Watson left the marital domicile located in Flowood, Mississippi on May 12, 1999, and began living in the same home as his veterinary technician, Ms. Foil, whom he was having an affair with, and her two children. Dr. Watson testified that he pays the $1,300 per month rent/mortgage, and the utilities on the four bedroom, three bath house he shares with his mistress and her children without any financial contribution from Ms. Foil. (See Dr. Watson's 8.05 form)

28

¶97.    This Court employs a limited standard of review when reviewing chancellor's decision. ***Miss. Dep't Human Servs. v. Shelby***, 802 So.2d 89, 92 (Miss. 2001). We will not disturb a chancellor's findings unless the court was manifestly wrong, abused its discretion or applied an erroneous legal standard. ***Sandlin v. Sandlin***, 699 So.2d 1198, 1203 (Miss. 1997).

### I.    Permanent Periodic Alimony

¶98.    The majority's decision reverses the trial court's holding as to alimony, therefore, I must respectfully dissent. As the decision regarding the award of alimony is within the chancellor's discretion and this Court requires consideration of the ***Armstrong*** factors, I believe that it is necessary to analyze each factor examined by the chancellor in reaching his decision. This Court has held that "[w]hether to award alimony, and the amount to be awarded, are largely within the **discretion of the chancellor**." ***Smith v. Smith***, 614 So.2d 394, 397 (Miss. 1993) (quoting ***Cherry v. Cherry***, 593 So.2d 13, 19 (Miss. 1991)) (emphasis added). On appeal, this Court is "required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." ***Newsom v. Newsom***, 557 So.2d 511, 514 (Miss. 1990). "This is particularly true in the areas of divorce, alimony and child support." ***Magee v. Magee***, 661 So.2d 1117, 1122 (Miss. 1995); *See* ***Tilley v. Tilley***, 610 So.2d 348, 351 (Miss. 1992); *See also* ***Nichols v. Tedder***, 547 So.2d 766, 781 (Miss. 1989). In ***Magee***, this Court used the definition of manifest as defined in Black's Law Dictionary to mean "unmistakable, clear, plain or indisputable." ***Magee***, 661 So.2d at 1122.

¶99.    **"[T]he amount of an alimony award is a matter to a great extent within the discretion of the chancery court** because of its peculiar opportunity to sense the equities of the situation before it." ***Holleman v. Holleman***, 527 So.2d 90, 94 (Miss. 1986) (citing ***Wood v. Wood***,

495 So.2d 503 (Miss. 1986)) (emphasis added). In **McNally v. McNally**, 516 So.2d 499, 501 (Miss. 1987), this Court stated that "[t]he chancery court's decision on alimony will not be disturbed on appeal unless it be found against the overwhelming weight of the evidence or manifestly in error."

¶100. The trial court's original findings of fact and conclusions of law set the alimony at $2,500 per month. On reconsideration, the permanent periodic alimony was raised by $750 to $3,250 per month due to Patricia being awarded all the marital liability.

¶101. In its findings of facts and conclusions of law dated February 2, 2001, the trial court stated it considered the award of alimony under the factors set forth in **Armstrong v. Armstrong**, 618 So.2d 1278, 1280 (Miss. 1993). In **Armstrong**, this Court listed the following factors the chancellor must consider in arriving at its findings and entering a judgment for alimony:

1. **The income and expenses of the parties**;
2. **The health and earning capacities of the parties**;
3. The needs of each party;
4. The obligations and assets of each party;
5. **The length of the marriage**;
6. The presence of absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, children care;
7. The age of parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. **Fault or misconduct**;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

Due to the necessity of reviewing the trial court's ruling on the **Armstrong** factors in determining the amount of alimony awarded, I have specifically addressed each of the trial court's analysis of the **Armstrong** factors which is as follows:

1. The first **Armstrong** factor is "the income and expenses of the parties."

30

Patricia testified extensively and specifically with regard to the income and expense items shown on her 8.05 form. Her income was alleged to be an "actual earnings" figure and also included the annual CRP payment which shell will receive as a result of the Court's ruling on the equitable distribution of the Panola County property [the timber land]. The deductions from income were also actual figures. The Court finds that Patricia has a net monthly income of $2,393.34.... The Court finds that Patricia's reasonable and ordinary expenses, as shown by her 8.05 form, total $6,714.13, per month which includes the mortgage payment (including taxes and insurance) of $1,695.00 per month, and the loan on the Panola County property of $372.50 per month. (Exhibit P-4).

In May, Mike listed his gross income at $12,500 per month (exclusive of the CRP payment), or $150,000.00 per year. At trial, he listed his income at $11,000.00 gross per month. **A review of Mike's recent tax returns, however, demonstrates that his 8.05 form understates his income.** Exhibit G-1, prepared by Mike's accountant, showed his Schedule C net income for 1997 to be $163,422.00. Mike's 1998 income tax return (Exhibit G-3) showed Schedule C income of $156,527.00. Hiss 1999 income tax return (Exhibit G-2) showed Schedule C income of $159,382.33. **Thus, during the past three years, Mike's Schedule C income has averaged $159,382.33, per year or $13,282.00 per month (gross).**

**It appears that Mike has also overstated his tax payments as deductions from gross income.** In 1998, Mike paid federal taxes in the amount of $48,975.00 and state taxes in the amount of $6,357.00, as shown by Exhibit G-3, for a total of $55,332.00 in taxes. In 1999, Mike paid $47,982.00 in federal taxes, and $7,412.00 in stated taxes, as shown by Exhibit G-2 for total taxes of $55,394.00. It appears that Mike has a net after tax income, (excluding CRP payments, interest, and dividends) in excess of 8,600.00 per month....

2.      The next *Armstrong* fact which must be considered by the Court is "the health and earning capacities of the parties."

**No issue was made of Mike's health.** His earning capacity as previously discussed by the Court, is demonstrated by the tax returns introduced into evidence.

The evidence clearly established that Patricia has some health problems which are currently impacting her ability to earn a living, and may continue to adversely impact her ability to earn a living in the future.

**Dr. Robert McGuire, an orthopaedic surgeon specializing in spinal surgery, testified as an expert witness by deposition at trial.** Patricia has been a patient of Dr. McGuire's since 1992. When Patricia originally saw Dr. McGuire, she had a disk herniation at the lumbar 3-4, and also at the lumbar 4-5. In 1998, she was diagnosed with a disk herniation at the cervical 5-6 which eventually resulted in surgery to replace the disk with a bone graft.

Dr. McGuire testified that Patricia's condition causes **considerable pain**. he prescribes anti-inflammatory medications for her, and muscle relaxers periodically as needed.... **Dr. McGuire testified that as a result of Patricia's medical condition, she is simply unable to work full time.** Currently, Patricia works

Mondays and Tuesdays, with a break on Wednesday, and resumes work on Thursdays and Fridays. **Dr. McGuire testified that due to her medical condition, Patricia has an increased risk of not being able to continue her work activities until normal retirement age because of the chronic changes in her spine that she has already experienced.... Dr. McGuire further testified that he would expect Patricia to have between one and three episodes per year when acute pain would prevent her from being able to work.**

Patricia's testimony, unrebutted by Mike, was that she and Mike had made plans in late December of 1998 for her to retire in June, 1999, due to her back condition. Patricia gave her employer official notice of her intent to retire in January, 1999.

Carol Booker, the business manager at Earle and Joseph's, Patricia's employer, testified that she and Mike has had several conversations about Patricia's back problems.... Ms. Booker also testified that Patricia is working at her maximum capacity, and is unable to earn more than her current income.

For most of the marriage, Patricia maintained disability insurance to protect her earning capacity for the family. In 1998, Mike suggested that they drop the disability insurance coverage and use the money for other purposes....

**It is clear from the evidence that Patricia is at least partially disabled.** It is also apparent from Dr. McGuire's testimony that her condition will worsen, and that in his opinion, she will be unable to work to normal retirement age.

Mike's affair with his assistant has substantially altered the plans for Patricia to retire;...

3.  Under *Armstrong*, the Court must consider "the needs of each party."

Patricia's reasonable needs are clearly set forth in her 8.05 form. Mike's needs are also delineated. Patricia's ability to meet her needs are based solely on her own ability to perform the work. Mike, however, has a very profitable veterinarian practice, which derives income through the effort of another salaried veterinarian hired by him, as well as veterinary technicians, and the sale of veterinary products.

4.  The next *Armstrong* factor is "the obligations and assets of each party."

The obligations and assets of each party, after the equitable distribution of the assets and liabilities, have been considered by the Court. For the most part, the assets are not income producing assets, from which Patricia could secure additional income without the imposition of alimony.

5.  The next *Armstrong* factor is "the length of the marriage."

These parties were married June 9, 1979, more than twenty-one (21) years ago. Patricia testified credibly that until the advent of Mike's affair with his veterinary assistant their marriage was "the American dream."

6.      The next *Armstrong* factor is "the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide child care."

There are no minor children in the home, and thus this factor plays no role.

7.      The next *Armstrong* factor is "the age of the parties."

**Patricia is fifty (50) years of age and will be fifty-one (51) in January.** She has worked throughout the marriage, in addition to her household duties and responsibilities. **Mike, is forty-three (43) years of age, and will be forty-four (44) in June.** His earnings history over the past three years indicates that he is in the prime of his professional career.

8.      Under *Armstrong*, the Court must next give consideration to "the standard of living of the parties, both during the marriage and at the time of the support determination."

**The testimony clearly showed that these parties enjoyed an extremely comfortable standard of living prior to the separation.**.... They traveled frequently.... On a day-to-day basis, they ate in nice restaurants frequently, bought nice clothes, and bought expensive vehicles which they traded approximately every two years. They had acquired savings and retirement funds. This Court is of the opinion that the parties were living beyond their means and neither party can expect to continue the style of living they had previously lived.

9.      Under *Armstrong*, the Court must next consider "the tax consequences of the spousal support order."

Patricia introduced as Exhibit P-14, certain calculations performed by Jim Koerber, CPA, relevant to the tax effect of Patricia's requested alimony payments. This testimony was undisputed by Mike's evidence, but were not totally accepted by this Court.

Of course, permanent periodic alimony is deductible by Mike from his gross income, and must be included by Patricia in her income for federal and state tax purposes. It is also elementary that Patricia must pay her reasonable and necessary expenses with "after tax" dollars...

Mr. Koerber's calculations are based upon Patricia's monthly expenses shown on her 8.05 form of $6,714.00 per month which the Court finds to be exorbitant.... After taxes, Patricia has $2,100.00 per month to meet these expenses from her earnings, and

additional $294.00 from the CRP income. That leaves Patricia with a deficit of $4,320.00 per month in her expenses.

Mike nets $7,794.42 per month. In order to provide Patricia with $4,320.00 per month of after tax income which she is requesting, Mike would be required to pay to her the sum of $6,595.00 per month. This Court cannot require Mike to pay Patricia more than 80% of his adjusted gross income for alimony. It is this Court's opinion that to give Patricia what she is requesting would be punishing Mike which is not proper in divorce proceedings.

This Court is of the opinion that Mike should be required to pay permanent periodic alimony of $2,500.00 per month.[20]

10.     Under ***Armstrong***, the next factor for the Court's consideration is "fault or misconduct."

Alimony must not be, and will not be used by this Court, as punishment for Mike's misconduct. Nevertheless, this misconduct is legitimately considered by the Court in allocating the financial burden which results when a single household with a combined earning capacity, is divided into two households supported by individual earning capacities.

**[I]n January, 1999, before Mike began his extra-marital affair[,]... the parties were planning Patricia's retirement, and contemplating a financially secure future from the fruits of their labors. Now, Patricia must continue to work in spite of her physical pain, with a financially shattered future before her. Mike has chosen to physically abandon his wife of the past twenty-one (21) years, for a woman who is more than twenty (20) years younger. The Court will not allow Mike to abandon Patricia financially.**

This Court cannot overlook the fact that Mike married Patricia when she had two children by a prior marriage with no child support coming in from their father and provided Patricia and her children with a roof over their head and helped care for the children and assist them through college with no legal requirement to do so.

11.     The next ***Armstrong*** factor for consideration is "wasteful dissipation of assets by either party."

**Mike testified that he pays the rent ($1,300.00 per month) and the utilities (as shown on his 8.05) on the four bedroom, three bath house he shares with his girlfriend and her children without any financial contribution from Ms. Foil** even though Mike pays her over $2,000.00 per month in salary. The evidence also showed that Mike gave Ms. Foil a thirty-three percent (33%) increase in salary at the beginning of this year.

---

[20] On reconsideration, the permanent periodic alimony award was increased to $3,250 per month.

¶102.   On a strict percentage basis, I find that the trial court's award is certainly well within the boundaries which have been affirmed in other cases. *See **Traxler v. Traxler***, 730 So.2d 1098 (Miss. 1998) ($3,150 disposable income and $750 monthly alimony equals 24% of disposable income); ***Watson v. Watson***, 724 So.2d 350 (Miss. 1998) ($4,000 monthly income and $1,000 monthly alimony equals 25% of gross income); ***Magee v. Magee***, 661 So.2d 1117 (Miss. 1995) ($5,500 gross income and $1,600 monthly alimony equals 29% of gross income); ***Curtis v. Curtis***, 796 So.2d 1044 (Miss. Ct. App. 2001) ($2,525 in net monthly income and $9,000 monthly alimony equals 36% of net income); ***East v. East***, 775 So.2d 741, 746 (Miss. Ct. App. 2000) ($3,500 gross monthly income and $1,300 periodic alimony equals 37% of gross income, in addition to child support).

¶103.   Based on Dr. Watson's gross income taken from tax returns for 1997, 1998, 1999, the trial court determined that Dr. Watson had an average gross income of $159,382.33, per year, or $13,282 gross income per month. Dr. Watson had listed his gross monthly income at $12,500, but he listed his monthly gross income at $11,000 at trial. The trial court did not believe the income figure on the 8.05 form when looking at the income stated on the tax returns. Using the trial court's average figuring, according to Dr. Watson's tax returns, of $13,282 per month, the $3,250 permanent periodic alimony payment represents 24% of his gross income. Even using Dr. Watson's own monthly gross income of $11,000 offered at trial, the alimony awarded represents 30% of his gross income.

¶104.   Therefore, I concluded that the trial court did not abuse its discretion in awarding periodic alimony in the amount of $3,250 per month.

> **II.      Valuation of Marital Home**
>
> **A.      Tax Roll Assessment**

¶105. As the majority directs that the issue of valuation of the marital home be revisited on remand, I must respectfully dissent. The trial court determined that, based on its experience, the value assessed by the county tax assessor was approximately 85% of the appraised true value. Therefore, the trial court increased the tax roll assessment of $263,280 by 15% or $39,492 to $302,772. **Neither Patricia nor Dr. Watson offered any expert opinion as to the value of the marital home before the trial court made its decision**. Patricia testified she believed that the value of the marital home was approximately $350,000. Dr. Watson testified that he believed the value was approximately $425,000, but he offered nothing to support that amount. The cost of construction on the home in 1992 was approximately $220,000.

¶106. In fact, Dr. Watson made his first request to have the trial court appoint an expert to value the marital home in his motion for reconsideration. Dr. Watson offers no evidence that the trial court prevented this request from being made before it rendered its decision. Dr. Watson also does not offer any evidence that he was prevented from calling an expert to testify before the trial court rendered its decision. Waiting until reconsideration to make a request for the first time in a post-trial motion for the trial court to appoint an expert to value the marital home, Dr. Watson cannot contend that the trial court erred in not allowing the appointment on reconsideration. **There is no evidence that the trial court abused its discretion. Dr. Watson presents no authority to require this Court to remand this matter to have an expert.**

### B.    Plevna Harris

¶107. While I concur with the majority's holding that the trial court erred in reducing the value of the marital domicile by $77,777 attributed to Patricia's mother, Plevna Harris (Harris), I must still briefly address this point as I dissent with the valuation calculation rendered by the majority. The trial court

awarded this reduction into judgment on reconsideration dated June 26, 2001. On reconsideration, the trial court cited no authority for the change in the treatment of the $77,777 so claimed by Patricia to be attributed to her mother. **On appeal, Patricia offers no authority to support this Court not reversing the trial court's decision rendered on reconsideration.** In fact, Patricia does not even attempt to distinguish the case sub judice from our holding in *Henderson v. Henderson*, 757 So.2d 285 (Miss. 2000).

¶108. The facts of the case sub judice are virtually identical to the facts in *Henderson*. Based on this Court's holding in *Henderson*, I concur that the trial court erred in modifying its judgment on reconsideration regarding the $77,777 attributed to Patricia's mother, Harris. Therefore, I find that the value of the marital home awarded to Patricia should be $302,772, not reduced by $77,777 to $224,995, for purpose of asset and liability distribution.

### C. Trustmark Home Mortgage

¶109. As the majority directs that this issue be revisited on remand, I must respectfully dissent. Dr. Watson briefly states that the trial court erred in failing to reduce the outstanding mortgage balance of the marital domicile by the amount of the payment that were paid by him during the time period between the filing of the complaint for divorce and the judgment of divorce. Dr. Watson contends that this resulted in Patricia receiving at least a $8,000 increase in the equity of the marital home. However, Dr. Watson admits that he only raised this for the first time in his motion for reconsideration. In setting the outstanding mortgage in its original findings of fact and conclusions of law, the trial court stated:

> There was some small differences in the parties' evidence regarding the outstanding balance of the Trustmark house mortgage. Mike [Dr. Watson] listed the liability at $110,000.00. Patricia listed the outstanding at $114,624.00. Patricia's testimony was that this figure was the exact figure she received from the bank the week prior to trial. The Court finds that the outstanding balance of this mortgage indebtedness to be $114,624.00.

¶110. Attached to his motion for reconsideration, Dr. Watson produced a letter from Ginger Sprinkle, payoff/assumption supervisor, at Trustmark Bank dated February 7, 2001, which listed the present principal balance as of April 1, 2001, at $106,372.61. The trial court did not specifically address the issue of the outstanding mortgage in its amended findings of fact and conclusions of law dated May 31, 2001. Trial in this matter was held on November 8, 9-10, 2000. I believe that the record does not support the fact that the trial court erred in setting the outstanding mortgage balance at $114,624 at the time the matter was tried based on Patricia's testimony as to the exact payoff amount the week prior to trial. The record does not reflect that at the time of trial the payoff was not $114,624 as testified to by Patricia. Dr. Watson produced no documents at trial with the outstanding mortgage balance and offered only an approximation of $110,000. **In my opinion, the trial court's decision was based on the information received at trial.**

### III.    Veterinary Practice

¶111. On cross-appeal, Patricia contends that the trial court erred in determining the value of the commercial veterinary building and veterinary practice itself.

### A. Commercial Building

¶112. As the majority does not, in my opinion, specifically address this issue regarding valuation of the building, I will briefly address it. Patricia argues that the trial court erred in assessing the value of the commercial building at $120,000. She contends that the building should have been valued at $150,000. Patricia testified that the parties had consistently placed the value of the building at $150,000 on a number of financial statements. The trial court noted in its findings of fact and conclusions of law that prior to the divorce action, Dr. Watson had consistently listed the value of the property at $150,000 on a number of financial statements and loan applications.

¶113.	At trial, Dr. Watson testified that in his opinion, the value of the building was presently worth $120,000. Dr. Watson based the decrease in value on foundation problems. Dr. Watson attempted to introduce an estimate of repairs for $30,000 to correct the foundation problems. However, based on Patricia's objection that the estimate was not furnished in discovery, the trial court did not allow the estimate to be introduced. Instead, the trial court allowed Dr. Watson to testify as to what the building was worth without discussing the $30,000 estimate for repairs to the foundation. The trial court allowed Dr. Watson to testify as to there being foundation problems but not as to the value placed on the foundation problems. The trial court also allowed Dr. Watson to testify as to his opinion of the value of the building. No tax receipt of the tax assessment value of the property was provided to the trial court.

¶114.	As neither party offered any expert testimony as to the value of the building nor any tax assessment receipts to set the value of the building, I do not find that the trial court erred in accepting Dr. Watson's testimony as to what the commercial veterinary building was presently worth in his opinion. As the evidence does not indicate that the trial court abused its discretion, I would affirm the trial court's decision.

### B.	Goodwill

¶115.	As I would remand on this issue on other grounds than the majority, I must respectfully dissent as to the majority's reasoning. At trial, Patricia's expert, Koerber, testified as to the value of the Magnolia Animal Hospital. Koerber placed a fair market value of $325,000 on Dr. Watson's 100% equity interest in Magnolia Animal Hospital as of October 1, 2000. Dr. Watson's expert, Bivens, was called in rebuttal to Koerber's valuation of the veterinary practice. Bivens tesified that the value should be lowered. While Bivens disputed other values or method of valuation used by Koerber, the area that merits discussion on appeal is that involving the value assigned by Koerber as a 5% specific company risk premium discount

39

due to Dr. Watson being a one man practice. Bivens testified that a reduction of the $325,000 valuation was in order, stating:

> **Now, the next item, specific company risk premium, 5 percent**. Well, that's -- that's a judgment -- that's a judgment call there. And that's okay. But my point is this. In coming up with these capitalization rates, the analyst should -- consider this business relative to other businesses like it. And in terms of the things that -- that the industry says are important, such as location, such as proximity of other practices, which I heard that mentioned, such as the demographics of the area, and -- and such as the fact that this is a single owner practice and not a multiple owner practice.
>
> When you have a single owner practice, the individual clients identify with that owner. When you have a multiple owner practice, they're more likely to be coming to the practice and not to that owner. So there are numerous things that need to be considered there. This location, for example, is in a location that would make it very unattractive for a prospective buyer. On the south end of Gallatin Street....
>
> [G]enerally, the industry says that there are things that are important: Location, demographics, proximity to other practices, which they describe as being negative. That's the industry research that I've done, which perhaps is beyond what I'm supposed to say. But so there are specific things that -- related to this practice which makes it unappealing to other practices in the industry.
>
> **And I think that was -- that is not quantified in this discount rate analysis which Mr. Koerber has determined here. In my opinion -- well, in my opinion, this -- this discount rate is too low by a considerable margin. And if it was where it should be, the value of the practice would be considerably changed. It would be lower.**
>
> We have -- what I've been describing here relates to the income approach. And I question the revenue stream, and I question the capitalization rate. And when you put those together, in my opinion, the value of the business should be lower under the income approach than he has shown it here because of errors which I think he was unaware of and because of capitalization rate -- and he didn't, I believe, consider the negative attributes of this practice, one of which I omitted was that -- one of the factors is the -- the staff of the practice.
>
> And one of his key staff members is his mother, which -- which is a negative factor. Because she's not going to stick around with a potential buyer. She's going to leave with Dr. Watson. So there are considerable negative factors that should have been considered, and I think they were not.

(emphasis added).

¶116. The trial court reduced the $325,000 estimate by $75,000, stating:

> The Court has carefully considered the report of Mr. Koerber, his direct examination testimony, his testimony under cross examination, Mr. Bivens' testimony in

rebuttal, and Mr. Koerber's testimony in surrebuttal. **Based upon the evidence presented through Mr. Bivens, the Court concludes that the value of Magnolia Animal Hospital Veterinary Clinic was over stated by $75,000.00 reflecting the value of Magnolia Animal Hospital Veterinary Clinic to be $250,000.00 rather than $325,000.00.**

**It is this Court's opinion that some degree of consideration should have been given to the factor that Dr. Watson was basically a "one-man business" whose reputation as an individual had a large impact on the value of his business. The consideration was not adequately treated by Mr. Koerber.**

(emphasis added).

¶117. In appealing the trial court's decision, Patricia does not discuss this Court's recent holding in *Singley v. Singley*, 846 So.2d 1004 (Miss. 2002) nor does she distinguish this case from the facts of *Singley*. Our jurisprudence mandates exclusion of goodwill from the value of a marital estate. However, the trial court's opinion does not clearly reflect whether goodwill was considered in this case or not. The trial court reduced the original valuation by $75,000, however, there is absolutely no evidence to support how the trial court reached such a reduction. Further, Koerber's valuation of Magnolia Animal Hospital did, in fact, include goodwill, and the trial court obviously relied on this report in making his decision regarding the value of the business. Therefore, I would reverse the trial court's decision as to the valuation of the business.

¶118. At the time this case was decided in the trial court below, the controlling case, *Singley v. Singley*, 2000 WL 1387961, *1 (Miss. Ct. App. Sept. 26, 2000) (rev'd by *Singley v. Singley*, 846 So.2d 1004, 1010 (Miss. 2002)), held that it was appropriate to include goodwill in the valuation of a business for purposes of a divorce action. In *Singley*, the court-appointed expert was James Koerber[21], who "determined the fair market value of [the Appellant's] dental practice using an asset-based approach, which

---

[21]This is the same James Koerber that testified as Patricia's expert in the present case. Koerber also filed an amicus curiae brief in *Singley*.

included intangible assets such as good will." *Id.* at 1009. However, we reversed the Court of Appeals opinion in *Singley*, holding that goodwill may not "be included in the valuation of a business when the issue of that valuation concerns distribution in a divorce action." *Singley*, 846 So.2d at 1010. In *Singley*, this Court adopted the approach of other jurisdictions of not including goodwill in the valuation of a business in divorce proceedings. This Court stated:

> The issue of goodwill in the context of distribution in a divorce action is indeed one of first impression. Although this Court has previously noted that goodwill was used by an expert appraiser in establishing the fair market value of a professional business, this Court did not specifically address the issue directly or elaborate thereon. The Court simply found no error by the chancellor in accepting the expert's valuation of the business and the case was reversed for other reasons. *In re Dissolution of Jackson Arthritis Clinic & Osteoporosis Ctr.*, 755 So.2d 418, 422 (Miss. 2000). However, we note that the case is distinguished from the case at bar as it is instructive only regarding valuation for the purpose of dividing a corporation between two business professional and not in the context of marital property division in a domestic case. More recently by footnote in *Mace v. Mace*, 818 So.2d 1130, 1133 n. 3 (Miss. 2002), this Court stated that "the opinions of other jurisdictions are split regarding whether goodwill may be considered in valuing a professional practice and, if so, how good will is to be calculated." We also noted that the issue was not before us, thus we declined to address it. *Id*. at 1136.
>
> We disagree with the Court of Appeals that goodwill may be included in the valuation of a business when the issue of that valuation concerns distribution in a divorce action. We join the jurisdictions that adhere to the principle that goodwill should not be used in determining the fair market value of a business, subject to equitable division in divorce cases.

846 So.2d at 1010-11.

¶119. This Court in *Singley* went on to state:

> The term goodwill as used in determining valuation of a business for equitable distribution in a domestic matter is a rather nebulous term clearly illustrating the difficulty confronting experts in arriving at a fair, proper valuation. **Goodwill within a business depends on the continued presence of the particular professional individual as a personal asset and any value that may attach to that business as a result of that person's presence. Thus, it is a value that exceeds the value of the physical building housing the business and the fixtures within the business.** It becomes increasingly difficult for experts to place a value on goodwill because it is such a nebulous term subject to change on a moment's

42

notice due to many various factors which may suddenly occur, i.e., a lawsuit against the individual or the death and/or serious illness of the individual or the death and/or serious illness of the individual concerned preventing that person from continuing to participate in the business. it is also difficult to attribute the goodwill of the individual personally to the business. **The difficulty is resolved however when we recognize that goodwill is simply not property; thus it cannot be deemed a divisible marital asset in a divorce action.** We recognize however that regardless of what method an expert might choose to arrive at the "fair market value" or that price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts. Consequently, today we join those sister states who prohibit goodwill from inclusion in valuing a business for distribution as marital property in a domestic case.

*Id*. at 1011 (emphasis added).

¶120. The present case was decided while the Court of Appeals opinion in *Singley* was still controlling, and this Court had no controlling precedent case on point. At the time the trial court entered its order in the present case, it was appropriate to include goodwill in such valuations.

¶121. Bivens, Dr. Watson's expert, testified that Koerber's methodology was flawed. Specifically, he testified that Koerber failed to take several factors into account, including the fact that the business was essentially a one-person operation. According to Bivens, the result of this error was that the estimated value was actually higher than it should have been. That is, under Bivens's view, certain factors should have been altered to account for the one-person nature of the practice, therefore ultimately reducing its estimated value. In an affidavit dated February 16, 2001, Mr. Koerber stated that his calculations were reduced to account for the fact that the practice was a one-person operation, thereby removing goodwill from the valuation.

¶122. The trial court determined that Koerber did not adequately consider the one-person aspect of Dr. Watson's practice. Considering the language of the order, it seems that the trial court agreed with Bivens's testimony regarding the one-person aspect of Watson's practice - the trial court deducted $75,000 from

the original valuation to make up for Koerber's error. However, the trial court's opinion does not specifically state whether goodwill was included in the court's valuation. As Dr. Watson puts it, "it is not clear in the Findings of Fact or Conclusions of Law how the [c]ourt" considered the impact of Dr. Watson's reputation on the value of his business.

¶123. Furthermore, there is absolutely no evidence supporting the trial court's reduction of the original valuation. The trial court reduced the valuation by $75,000, and there is no indication in the record of how the trial court reached this value. There is literally no testimony or other evidence regarding the extent to which Dr. Watson's "goodwill" increased the value of the business. While the trial court might have agreed with Bivens that the appraisal was flawed, its decision to reduce the original valuation by $75,000 does not indicate that to be the basis for the $75,000 reduction. **Thus, the trial court's ultimate valuation was not based on substantial evidence, and under our controlling standard of review, it is appropriate for us to reverse on this issue.**

¶124. We have described "goodwill" as a "rather nebulous term." *Id.* Some of our sister States have recognized that this nebulous term is actually comprised of two separate but related concepts. The Indiana Supreme Court has described goodwill as "the value of a business or practice that exceeds the combined value of the net assets used in the business." *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999). The court determined that in a professional practice, goodwill could be "attributable to the business enterprise itself by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business." *Id.* However, goodwill might be associated with the "individual owner's personal skill, training or reputation." *Id.*

¶125. Enterprise goodwill "'is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers.'" *Id.* (quoting Allen Parkman, *The*

*Treatment of Professional Goodwill in Divorce Proceedings*, 18 FAM. L.Q. 213, 215 (1984)).

Further, the court in *Yoon* stated:

> Factors affecting this goodwill may include a business's location, its name recognition, its business reputation, or a variety of other factors depending on the business. Ultimately these factors must, in one way or another, contribute to the anticipated future profitability of the business. Enterprise goodwill is an asset of the business and accordingly is property that is divisible in a dissolution to the extent that it inheres in the business, independent of any single individual's personal efforts and will outlast any person's involvement in the business. It is not necessarily marketable in the sense that there is a ready and easily priced market for it, but it is in general transferrable to others and has a value to others.

711 N.E.2d at 1268-1269 (internal citations omitted). In contrast, the court in *Yoon* concluded that personal goodwill is a personal asset and as such, is not divisible at divorce. *Id.* at 1269. This is true because "any value that attaches to a business as a result of this "personal goodwill" represents nothing more than the future earning capacity of the individual." *Id.*

¶126. A close reading of our opinion in *Singley* reveals that we have not explicitly recognized the distinction between personal and business enterprise goodwill, although we did note that other jurisdictions recognize it. 846 So.2d at 1010 n. 2. *Singley* limits this Court's definition of goodwill to personal goodwill. Under our definition, "[g]oodwill within a business depends on the continued presence **of the particular professional individual** as a **personal asset** and any value that may attach to that business as a result of **that person's presence**." *Singley*, 846 So.2d at 1011 (emphasis added). In the case of a solo practice as we have in the case sub judice, these two assets are interwoven.

¶127. In his calculations, Koerber applied a specific company risk factor "of five percent (5%) to the discount rate to reflect that Dr. Watson's practice was a sole proprietorship and therefore has a greater risk than a professional practice." His report states that this percentage was based on considerations such as key employees, financial statements, and other information. While Koerber reduced the estimated

values by five percent, there is no indication that this five percent accounts for Dr. Watson's personal goodwill.

¶128.   In determining the value of a business for a divorce action, the value is properly reduced to account for the absence of the sole proprietor, as is the case here, to account for personal goodwill.  But where the estimated value of the business is based on projected future cash flow, the determination of that value assumes that the business will in all other relevant aspects remain the same.  In the present case, Koerber utilized the income-based approach for his appraisal.  This method is based, in part, on historical cash flows. Projected future cash flows are extrapolated from that data.  These estimations assume that customers will continue to come to Magnolia Animal Hospital for their veterinary needs.  This is the very essence of goodwill.

¶129.   Koerber testified that there is no real customer base associated with this business, but his report implicitly includes name recognition of the practice as a factor.  The name of this practice is undoubtedly recognized and will continue to be recognized in the Jackson, Mississippi area, whether Dr. Watson continues to practice there or not.  In my view, the name recognition of this business is due to Dr. Watson's presence at the practice.  That is, to the average consumer, "Magnolia Animal Hospital" is synonymous with "Dr. Robert Michael Watson."  Further, Koerber's report implicitly considers the reputation of the business itself.  In a solo practice like Magnolia Animal Hospital, the reputation of the business is analogous to the professional's reputation; that is, Dr. Watson's professional reputation is imputed to the business itself.  Because Dr. Watson managed the practice and served as the lone veterinarian, he himself established business relationships with suppliers and the company employees.   Thus, in a case such as this, personal goodwill and enterprise goodwill are actually the same.

46

¶130. The nebulous term "goodwill" includes both enterprise and personal goodwill, and I believe we should recognize this distinction. However, neither intangible asset should be included when the value of a solo practice is determined in divorce actions because personal goodwill and enterprise goodwill are identical in such cases. As in *Singley*, neither party raises the issue of whether enterprise goodwill is part of our definition, but we should clarify our holding in *Singley* and hold that all types of goodwill shall be excluded from valuations of solo practices. Learned professionals such as Koerber and Bivens could accurately and effectively reduce estimated business values to remove all types of goodwill from their results. A remand will allow the trial court to clarify its opinion as to the reduction of the $75,000. This is in keeping with our holding that the trial court does not use enterprise goodwill or personal goodwill in valuing marital property for purposes of distribution. Under the facts of this case, enterprise and personal goodwill are the same. Therefore, I must respectfully dissent with the majority's holding as I would reverse and remand on this issue for the trial court to clarify its opinion as to the $75,000 reduction in valuation of the veterinary practice.

## IV.  Equitable Distribution of Marital Estate

¶131. As I believe the trial court made an equitable distribution of the marital estate with the parties receiving a 50/50 division of the marital property, I must dissent. Since we require the trial court to analyze each of the *Ferguson* factors, I will address the trial court's findings and each of the factors. Before applying the *Ferguson* factors to make an equitable distribution of the marital property, the trial court devoted 11 pages of his original findings of fact and conclusions of law to first identify what was the parties' "marital property" as opposed to "separate/nonmarital property" according to *Hemsley v. Hemsley*, 639 So.2d 909, 915 (Miss. 1994) and assessed a value to the marital property. In *Ferguson v. Ferguson*,

639 So.2d 921, 928 (Miss. 1994), this Court established the following factors that should be considered

in reaching a decision on the equitable distribution of marital property:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
   a. Direct or indirect economic contribution to the acquisition of the property;
   b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
   c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or intervivos gift or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.

¶132. The trial court then devoted 15 pages of its original findings of fact and conclusions of law to

employing the *Ferguson* factors to the parties' marital assets and liabilities in order to provide an equitable

decision. The trial court stated:

The Court has attempted to apply each and every one of the *Ferguson* facts to each marital asset and liability, both collectively and individually. From the application of the factors the Court finds, based upon the evidence presented, that this marriage was an equal partnership in every sense of the word until Mike [Dr. Watson] began a sexual relationship with his employee, Laurie Foil. The Court finds that Patricia should receive approximately fifty percent (50%) of the net assets acquired and accumulated during this marital partnership based upon her direct and indirect economic contributions, her contribution to

48

the stability and harmony of the marriage, and the other factors set forth in the *Ferguson* decision.

¶133. In its original findings of fact and conclusions of law, the trial court divided $1,216,662.52 in marital assets between the parties with Dr. Watson receiving $566,113.48 and Patricia receiving $650,121.07. Patricia was assigned the marital liabilities totaling $162,955.99. After the division, Patricia was left with a deficit of $78,948.40. In order to render a 50% division of the marital assets and liabilities and correct the deficit, the trial court also awarded Patricia a cash payment from Dr. Watson in the amount of $39,474.20 to be paid in three equal yearly installment payments of $13,158.07. The division amounted to Dr. Watson and Patricia each receiving $526,639.28.

¶134. However, the trial court on reconsideration amended its findings of fact and conclusions of law. The value of the marital home was reduced by $77,777 as discussed in issue II wherein this Court determined that the amount should be added back to the value of the marital home. The trial court also included $26,881.32 for Dr. Watson's certificate of deposit into Dr. Watson's assets which was discussed by the trial court in its original findings of fact and conclusions of law but was left out of the trial court's award of marital assets. The trial court also reduced the value of Patricia's marital personal property (furniture, jewelry, etc) by $15,000.[22]

¶135. The trial court's charts reflect a $15,000 reduction in the value assigned to Patricia's marital personal property (furniture, jewelry, etc.) from the original decision to the decision rendered on reconsideration. The original chart in the original decision designates Patricia's marital personal property (furniture, jewelry, etc.) at $35,000 ($20,000 for furniture, furnishings and appliances plus $15,000 for the

---

[22] The parties did not raise an issue on appeal as to the trial court's reduction in valuation of Patricia's jewelry. The parties also did not address the trial court's $5,000 mathematical error on the chart in the reconsideration opinion as to Patricia's marital personal property.

49

marital property, a Rolex watch). The chart contained in the reconsideration decision designates Patricia's personal property (furniture, jewelry, etc.) at $20,000, resulting in a $15,000 reduction by the trial court. The only explanation provided by the trial court in reaching the reduction was that the value assigned to the marital property, a Rolex watch, awarded to Patricia should be reduced from $15,000 to $5,000 on reconsideration.

¶136. It appears that from the written decision on reconsideration to the numerical chart prepared by the trial court on reconsideration, the trial court incorrectly transferred the amounts. On reconsideration, the written decision states that the value of the Patricia's marital personal property is $25,000, including the Rolex watch. However, the numerical chart lists the amount of Patricia's marital personal property is listed as $20,000. Therefore, based on a lack of explanation by the trial court as to the $5,000 discrepancy between the written decision and the numerical chart used to divide the marital estate, there exists a mathematical error of $5,000.

¶137. Finally, the trial court's decision on reconsideration contains further mathematical errors that were not addressed by either of the parties in their briefs.[23] Due to the mathematical errors on the numerical chart, the trial court erroneously calculated Dr. Watson's assets by $85,380 to be $507,614.80. Therefore, I will use the correct figures to adjust the trial court's decision for its mathematical errors. Dr. Watson actually was awarded $592,994.80 of the marital assets by the trial court when accounting for the mathematical errors.[24] Patricia was awarded $557,344.07 of the marital assets which should be increased by $77,777 according to issue II, to $635,121.07. As discussed above, Patricia's marital personal

---

[23] The following analysis addresses the correct calculations to adjust for the trial court's mathematical error. The trial court prepared charts in its original opinion and findings of fact and in its opinion and findings of fact on reconsideration. The chart included on reconsideration contains the mathematical errors.

[24] $507,614.80 + 85,380 = $592,994.80

property was incorrectly stated as $20,000 on the numerical chart in the reconsideration decision rather than $25,000, which requires us to add $5,000 to Patricia's total marital personal property. Therefore, Patricia's total marital assets actually are $640,121.07.[25]

¶138. Patricia was assigned all the marital debt of $162,955.99. Therefore, Patricia was actually awarded $477,165.08.[26] Patricia is then left with a deficit of $115,829.72.[27] Adjusting the award of marital assets and liabilities to account for Patricia's deficit in order to maintain the trial court's equal division of the marital estate, I find that Patricia should be awarded a cash payment of $57,914.86, rather than $56,613.36 awarded by the trial court.[28] The $57,914.86 is to be paid to Patricia over three years in installments of $19,304.95.[29] This decision results in a total equal distribution of $535,079.94 for Dr. Watson and $535,079.94 for Patricia in keeping with the trial court's 50/50 division of the marital property awarded to each party.

¶139. As I find that the trial court properly applied the *Ferguson* factors and awarded the parties a 50/50 division of the marital estate, I find that the trial court did not err in its decision. The parties received an equitable division of the marital assets and liabilities. However, the amounts awarded are corrected for the trial court's mathematical errors as previously discussed and by the $77,777 increase to Patricia's assets as discussed in Issue II involving valuation of the marital home.

---

[25] $557,344.07 + 77,777 + 5,000 = $640,121.07

[26] $557,344.07 + 77,777 + 5,000 - 162,955.99 = $477,165.08

[27] Dr. Watson's total marital estate $592,994.80 - Patricia's total marital estate $477,165.08 = $115,829.72 deficit to Patricia.

[28] $115,829.72 deficit/ 2 = $57,914.86 cash payment.

[29] This is in keeping with the trial court's decision which allowed the cash payment to be paid by Dr. Watson in equal installments over three years. $57,914.86 / 3 years = $19,304.95 per year.

51

## Conclusion

¶140.   Therefore, I must respectfully dissent from the majority's decision.  In my opinion the trial court's award of $3,250 per month in permanent periodic alimony to Patricia should be affirmed.  I find that the trial court did not err in determining the value of the marital home to be $302,772.  However, I concur with the majority that the trial court erred on reconsideration in reducing Patricia's award of the marital home by $77,777.  In my opinion, the trial court did not err in assessing the value of Dr. Watson's commercial veterinary building to be $120,000.  However, I believe the trial court erred in granting a $75,000 reduction in the original value of the business assigned by Koerber without providing a basis or explanation.  Therefore, I would remand this matter to allow the trial court to address the $75,000 reduction in the value of the Magnolia Animal Clinic only.  I find that the trial court provided an equitable division.  The trial court awarded a 50/50 division of the marital assets and liabilities between the parties.  However, I believe the equitable division must be corrected to reflect the apparent mathematical errors and the $77,777 reduction in Patricia's assets erroneously awarded on reconsideration.